FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 1 2015

THE UNITED STATES DISTRICT COURT OF NORTHERN GEORGIA

ATLANTA DIVISION

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

EMMANUEL OHAI

    Plaintiff pro se,

V.

DAL GLOBAL SERVICES,  LLC

DARRELL COOPER,

SEGUN K. ABORISADE,

    Defendants

Civil Action No. **1: 15 - CV - 3305**

**DEMAND FOR JURY TRIAL**

## EMPLOYMENT DISCRIMINATION, FRAUD AND TORTIOUS BAD FAITH BREACH OF CONTRACT COMPLAINT.

This is an action for compensatory, exemplary and injunctive relief under the provisions of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. Sections 2000e-5(g) and 2000e-3, et seq. (hereinafter "Title VII") and for declaratory relief under 28 U.S.C. and breach of Contract Georgia Act O.C.G.A. 13-6-14, GA O.C.G.A. § 13-5-5 and Georgia Civil Tort Statue O.C.G.A. § 51-12-5.1. based on the discriminatory and retaliatory employment practices of DAL Global Services.

### TITLE VII VIOLATION

Title VII of the Civil Rights Act of 1964 prohibits employment practices that have a discriminatory impact on employees that object to unlawful practices.

### PARTIES

1. Plaintiff Emmanuel Ohai is a citizen of the United States, resident of the State of Georgia, and subject to the jurisdiction of this Court.

2. Defendant DAL Global Services, LLC is a Georgia Limited Liability Company with its office located at 980 Virginia Avenue, 4th Floor Atlanta, GA 30354 and defendant's registered agent for service of process, Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

3. Defendant Darrel Cooper is currently employed by Defendant DAL Global Services as the General Manager of the Security Services Division.

4. Defendant Segun K. Aborisade was employed by Defendant DAL Global Services at all relevant times as an Account Manager.

5. Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned each of the defendants was the agent, client, servant, employee, and/or co-conspirator of each of the other defendants, and, in doing the acts hereinafter alleged, was acting within the course and scope of their authority as such agent, servant, employee, and/or co-conspirator with the permission and consent of their co-defendants and, further, that the defendants, and each of them, have authorized, ratified, and approved the acts of each of the other defendants with full knowledge of those acts.

## JURISDICTION AND VENUE

6. Jurisdiction and venue are proper in this Judicial District.

## EXHAUSTION OF ADMINSITRATIVE REMEDIES

7. Plaintiff has exhausted his administrative remedies in accordance with U.S.C. Section 2000e-16 (c) in that he filed an Administrative EEO Complaint on June 17, 2015 asserting that defendants engaged in discriminatory and retaliatory employment practices towards him. See attached hereto as **Exhibit# 1** U.S. Equal Employment Opportunity Commission (EEOC) Dismissal and Notice of Rights and Information Sheet.

**FACTS GIVING RISE TO PLAINTIFF'S CAUSE OF ACTION**

8. Over the past four years, plaintiff Emmanuel Ohai repeatedly complained and identified to DAL Global Services Senior Management various unlawful, discriminatory and retaliatory conduct by the DAL Global Services Account Management team and office staff.

9. The unlawful activities included: (a) Illegal classification of employees for purposes of administering company offered benefits.

   (b) Discriminatory scheduling practices by DAL Global Services Account managers that gives favorable schedules and posting to their social acquaintances, friends and family (c ) abuse of the ready reserve program by the Account Managers; hiring of staff who are never scheduled to work but enjoy flight benefits as other employees who are constantly harassed to work the undesirable shifts.

   (d) Arbitrary company benefits package that reserves eligibility to company benefits such as bereavement pay, the employee pass travel program, post retirement travel pass to the discretion of the Account Managers. DAL Global Services travel pass policy's definition of "eligibility' as communicated by Defendant Darryl Cooper in a memo to all employees is unlawful.

10. Plaintiff suffered constant hounding and harassment with threats of dismissal for not working enough hours to keep his ready reserve status, while other social acquaintances of DAL Global Services Account Managers similarly situated as plaintiff were accorded more favorable treatment, good posting, and favorable schedule and not adversely treated as plaintiff.

11. At all relevant times hereto plaintiff performed his duties with DAL Global Services in a successful manner. Plaintiff's work and work ethic was comparable if not better than, that of his co-workers.

12. Plaintiff's work attendance record was comparable if not better than, that of his co-workers.

3

13. Defendant DAL Global Services has 3 classes of employees; full time, part-time and ready reserve.

14. Defendant DAL Global Services attracts mostly well qualified and conscientious employees because of its employee pass travel program on the Delta network.

15. Around early to mid-2011, DAL Global Services Management had a problem of having so many acquaintances of the Account Managers hired as ready reserve officers who were never available for work with cooperation from DAL Account Managers

16. This set of ready reserve officers were hired by the Account Managers just for the purpose of having their family and social acquaintances enjoy the employee travel pass without putting in the minimum of 48 hours of work monthly as required by the Ready reserve policy.

17. When desirable part-time shifts in desirable locations became available, these Account Managers conspired with one another and often ignored the DAL Global Services long standing seniority policy for job opportunities to ensure that their family members and social acquaintances got the jobs.

18. Amongst Defendant DAL Global Services part time and ready reserve employees are mostly mid-level professionals who were attracted to work for DAL Global Services because of the opportunity for them and their eligible family members to travel on the Delta network. At the SunTrust Account of DAL Global Services, plaintiff has had the pleasure of working with a School principal, Government workers both State and Municipal workers, School teachers, Nurse, City of Atlanta Fire-fighter Captain, several Military war veterans, Police Officers including one as high ranking as a Lieutenant.

19. Plaintiff has worked in all 3 employment classifications starting out as a full time employee, later changing to part time working 12 hour shifts on Saturday and Sunday at some point, then

4

changing to ready reserve and when the opportunity came to work in the Suntrust Data Center, plaintiff changed his status back to part time.

20. In July 2011 the 6:30:00 am – 3:00 pm weekend shift at the Data Center became available due to the fact that Adaeto G., who had worked that shift, had been promoted to a Supervisor and posted to a different site.

21. Plaintiff's expectation that he will have equal opportunity to bid for the open shift and thus have his employment status changed from ready reserve to part time was dashed as Defendants failed to post the open shift in clear violation of the DAL Global Services policy which stipulates that such shift openings have to be posted so that every employee will have the opportunity to bid for it.

22. Ms. Turner, a female with less seniority or professional qualification for that position than plaintiff was given the shift in violation of DAL Global Services own policy.

23. On August 15, 2011 plaintiff complained about this violation of his civil right and DAL Global Services company policy by sending an email to his immediate supervisor Scott Stedtefeld and team lead Mr. Chiles which stated:

"Dear Mr. Stedtefeld and Mr. Chilies,

I have been concerned lately with the kind of hours I have been scheduled to work. I feel that I get the hours that no one else wants to work. For example, I understand that Mr. Adeto Garnett shift has been open for a few weeks now and only one ready reserve officer has been working that AM Shift on Saturday and Sunday morning. For 2 weeks in a row, I have had to work the 2nd Shift on a Sunday afternoon. I understand that I submitted Sunday afternoons as days I am available to work so also have the other Ready Reserve Officers.

I would like to know the yardstick [If any] that was used to schedule this officer on the AM shift at the Data Center for so many weeks while I have to work Saturday nights and second shift on Sunday? Please correct me if I am wrong.... If any shift becomes available, I would imagine that it would be posted. And if the opening is temporary, my expectation is that all the Ready Officers would have same opportunity to work that shift.

5

In all the 8 years I have worked at the Suntrust Account, I have enjoyed my experience both professionally and personally until now. I have always prided myself as a team player who is willing to go the extra mile to get the job done. If the impression that I have expressed above is wrong or misplaced, please permit me, on the other hand if they are true then something needs to be done to rectify the situation."

24. On August 16, 2011 in response to my complaint via email to my immediate Supervisor Scott

Stedtefeld, I got a phone call from Scovadis Howard, DAL Global Services Human Resources

Representative, who was verbally abusive and rude. Narrative of phone conversation provided,

inter alia:

[Plaintiff] there is nothing I can do to correct the situation. If you cannot work the shifts you are

scheduled to work then quit.

25. During aforementioned phone call, plaintiff requested from Scovadis Howard a copy of the DAL

Global Services Ready Reserve Program policy, which she emailed a few minutes after the phone

conversation; attached hereto as **Exhibit# 2**

26. It took over four weeks after complaining to immediate supervisor Scott Stedtefeld and speaking

with Human Resources Representative Scovadis Howard about the illegal conduct of DAL Global

Management Services Account Managers for them to finally post the Suntrust Data Center

Officer job.

27. On September 16, 2011 plaintiff received as an attachment to an email from Defendant Segun K.

Aborisade the job posting, in that email defendant Segun K. Aborisade also wrote a message

which is provided in quotes, inter alia:

"[Plaintiff] *Please be advised that this position will require you or anyone interested to work every weekend unless you request for day off and it will be subject to an approval based on operational needs.*"

6

28. Plaintiff is aware that no other employee that was similarly situated or received the SunTrust Data Center Officer job posting was subjected to the unsolicited harassment and message from Defendant Segun K. Aborisade.

29. Plaintiff having most seniority and being most qualified of the candidates that applied eventually got the position of the Suntrust Data Center Officer 6:30 am- 3:00 pm.

30. After plaintiff complained to DAL Global Services Management about their discriminatory and unlawful practices, plaintiff became a target for all kinds of retaliatory conduct from Defendants.

31. From October 2011 when plaintiff started work at the 6:30am-3:00 pm shift in the Suntrust Data Center, plaintiff's work was subjected to a far more intense scrutiny than his similarly situated co-workers.

32. As this became a big problem within the organization, Plaintiff sought to change his employment status from ready reserve to part-time so as to avoid the discriminatory and unlawful practices of the DAL Global Services Account Managers but was often given the run around.

33. Plaintiff continues to work at DAL Global Services only with the hope that someday he may be able to retire and enjoy the post retirement travel pass.

34. As at November 1, 2012 the Defendant DAL Global Services retirement pass privilege policy stated that Full-time and part-time DGS employees who have completed at least 10 years of continuous service and are at least 52 years of age were eligible. In addition, those full-time and part-time DAL Global Services employees who have 25 years or more of service and have completed at least 10 years consecutive service from their most recent date of employment are also eligible for retiree pass travel privileges. Full-time employees must average 32 hours per week or more and part-time employees must average 20-31 hours per week over the 90 days prior to the date of the Retirement Application to qualify. In computing years of service and

7

continuous service for retirement pass travel eligibility, time worked at DGS and time worked at
another Delta affiliate may be combined as long as there is no break in service in the transition
between DGS and the other Delta affiliate. The date of employment used for retiree standby
pass travel will be the most recent date of continuous employment. Upon reaching eligibility
under either of these options, those desiring to retire from DAL Global Services have to
complete the Retirement Application form to their manager/supervisor at least 90 days prior to
their desired retirement date. The form will be forwarded to Human Resources and upon
approval employee will be contacted by their manager for confirmation of their retirement date.

35. Defendant Darrell Cooper advanced a scheme and communicated unlawful policies with false
assertions, illegal job classifications and outright misrepresentation of facts regarding company
pass travel program that has cost plaintiff additional amount of dollars to fly standby and will
unfairly render plaintiff in-eligible for post-retirement travel pass to all employees.

36. On December 20, 2013 Defendant Darrell Cooper caused an email to be sent to plaintiff and
other employees announcing a change to the DAL Global Services employee pass travel
program. See attached hereto as **Exhibit# 3** the DAL Global Pass Policy Change memo with email
addresses and phone number redacted.

37. In the email memo that Defendant Darrell Cooper sent to plaintiff and other employees, he
intentionally made false statements including the one provided in quotes below:

*"Government regulations allow only employees working in airline or aviation related positions
eligibility for free travel privileges."*

8

38. DAL Global Services has "Rover" positions that entail working in both airline and aviation and non-airline or aviation sites. See attached hereto as **Exhibit#6** a recent DAL Global Services job posting.

39. Rover positions are considered by DAL Global as airline and aviation related assignment based on arbitrary and unlawful factors.

40. Defendants have unlawfully put themselves in a position to arbitrarily offer the temporary rover position to an employee who may otherwise be ineligible for post-retirement travel pass, as they [Defendants] have the discretion to determine when a Rover position is considered as aviation or airline related assignment. Instilling fear and intimidating anyone who dared to raise objection.

41. Defendant Darrell Cooper acting in his capacity as the General Manger of DAL Global Services Division held a couple of Town Hall meetings with DAL Global Services employees but was unable to provide proof of the Government's involvement in the DAL Global Services company policy change.

42. A female co-worker at Suntrust Plaza Charissa H. who was weeks from retirement at the time of the town hall meeting, and was not qualified for post-retirement travel pass, unless she was approved for transfer to an airline or aviation job site by an Account Manager, had asked if she could be given special consideration, to which Defendant Darryl Cooper answered, para-phrased in quotes, narrative provided:

*"See us later; perhaps, there is something we can do to help"*

43. Since this policy took effect on January 1, 2014, plaintiff has paid a higher price than other DAL Global Services employees who are illegally classified as "employees in aviation or airline related assignment" for same flight services.

9

44. As a result of the DAL Global Services pass policy change, domestic travel that used to cost plaintiff $0 was now costing an average of approximately $80 round trip. Likewise a trip to Lagos, Nigeria which used to cost plaintiff approximately $80 was now costing plaintiff approximately $433

45. DAL Global Services is in the business of making profit, the disparity in the prices offered for travel on employee travel pass program has affected plaintiff adversely as it raises an issue of conflict of interest on the part of Defendants who reserve the discretion for eligibility of the travel pass program.

46. After plaintiff raised concerns about the illegal and discriminatory new employee travel pass policy, DAL Admin clerk Minnette Pass, removed plaintiff's email from the Company employee email mailing list thereby denying plaintiff administrative support and excluding plaintiff from getting important job posting information that other DAL Global Services employees similarly situated get real-time.

47. Plaintiff is aware that DAL Global Services employee Johnnie P who is similarly situated is still on the mailing list and only recently got transferred to an airline or aviation job site as a result of applying for a job opening he got to know about from email sent to the company employee mailing list which plaintiff was removed from without any explanation.

48. With the new DAL Global Services travel pass policy change, except for ticket price and access to list on other airlines, all other aspects of the pass travel , such as seniority based boarding remain the same for all employees no matter if they are in aviation or airline related work site or not.

49. On one occasion approximately a couple of months after plaintiff started working the 6:30am-3:00 pm shift in the Suntrust Data Center, plaintiff showed up to work late. Even though it was

10

an un-usual occurrence for plaintiff to be late for work and even though plaintiff made the proper phone notification to advise client supervisor of his late arrival to work.

DAL Global Services Account Manager Defendant Segun K. Aborisade responded the following Monday by setting up a new triplicate and redundant sign-in procedure whereby employees at the Suntrust Plaza 1st shift only had to call (XXX) XXX-4179 number from a designated land line at the client job site break room to announce their arrival at work. That process has continued till date with most other employees similarly situated not participating or calling that number any longer. All these 4 years only plaintiff and one other employee M. Love still call that phone number to report we are on duty. All through this period, all other DAL Global employees on all 3 shifts came to work late at different times and it was never an issue to the extent that a new shift sign-in procedure will be introduced.

50. Other employees who are supposed to call the designated call-in number but have not done so have not faced any disciplinary action.

51. On February 10, 2014, plaintiff wrote my immediate Supervisor Scott Stedtefeld to complain that on his 10 year anniversary with DAL Global Services which was March 23, 2013, he never received any award or recognition for his meritorious service as stipulated by company policy.

52. A few weeks after plaintiff complained and almost 1 year of attaining milestone, plaintiff stumbled across a vanilla envelope with his name on it in the dock office. In that envelope was a letter of commendation on a black and white photocopied letterhead. Other employees who are similarly situated receive their commendation letter on a colored Delta Global Service letter head, a gold lapel pin etc. at an award ceremony with a handshake from a manager of the company handing out the commendation letter and award.

53. When plaintiff's colleague M. Love attained 10 year anniversary of employment by DAL Global

    Services, he was presented his award letter in a ceremony with other employees and client

    attending as is the practice in DAL Global Services.

54. On November 11, 2014 Plaintiff sent an email to Defendant Segun K. Aborisade to make him and

    Defendant DAL Global Services aware of the passing of his late dad. In that email

    communication, plaintiff requested for time-off duty for the weekend of December 13 and 14.

55. As part of Delta Global Services bereavement policy, in addition to cash payment, employees

    who have to travel by air using the employee travel pass are usually approved for S1 boarding

    priority which gives them a good chance of getting a seat on the flight as standby passengers.

56. Plaintiff never received any bereavement pay from Defendant DAL Global Services.

57. Plaintiff's request for S1 boarding priority was also denied. Defendant Segun K. Aborisade's

    email to plaintiff advising plaintiff of denial is provided in quotes:


"Emmanuel,
I just got a reply from our pass bureau that they can't approve your travelling on S1A priority became
the funeral is not recent. According to them it has to be for an immediate death and funeral. You will
have to use your regular s3c priority. If you have any questions, please be free to give me a call."

58. Defendant DAL Global Services employs several Christians from the Southern part of Nigeria and

    is aware that for a well-aged and traditionally titled person such as plaintiff's late father, there

    can never be immediate "death and funeral"

59. Plaintiff is aware that other DAL Global employees similarly situated have traveled on S1 priority

    boarding to attend the funeral of a loved one without such restrictions as immediate "death and

    funeral"

12

60. On November 30, 2014 plaintiff wrote DAL Global Services to report that his joint checking account with spouse account number ending in xxxxxx4410 at Bank of America had not been credited with his salary for working on November 22, 2014 and November 23, 2014.

61. After proper investigation was carried out, plaintiff became aware that the bank had closed joint account because one of the party to the account had requested that the account be closed.

62. Defendant DAL Global Services issued Plaintiff a live check being salary for those 2 days worked on November 22 and 23, 2014.

63. Subsequently, Bank of America opened another checking account for plaintiff. The new account as was the case with the previous one had a $12 monthly maintenance fee attached if not setup with salary direct deposit.

64. On December 2, 2014 plaintiff submitted a completed DAL Global Direct deposit request form to Admin Clerk Minnette Pass with the proper authorization given to Delta Global Services to cancel the old direct deposit account.

65. On December 2, 2014 plaintiff received a response to his request for a new direct deposit via email from Defendant Segun K. Aborisade. Defendant Segun K. Aborisade's response is provided in quotes, inter alia:

"Emmanuel, Minnette pass will handle your request. It takes about two weeks to establish a new direct deposit account. Minnette, please stop his direct deposit for this week and have a live check issue to him."

66. On January 9, 2015 plaintiff wrote defendant Segun K. Aborisade telling him that plaintiff's direct deposit that Defendant Segun K. Aborisade told plaintiff takes about two weeks had not kicked in yet and it was way past two weeks.

67. Not getting any response to plaintiff's email dated January 9, 2015, plaintiff forwarded his previous email of January 9, 2015 to defendant Segun K. Aborisade on January 12, 2015.

13

68. On January 27, 2015 defendant Segun K. Aborisade finally responded to the reminder of January

12, 2015 and forwarded plaintiff's previous emails and reminder while writing to DAL Global

Payroll/Admin clerk Minnette Pass quote provided inter alia:

"Minnette, Did you have any updates on Emmanuel Ohai's direct deposit request. He still
continue to get live check every week."

69. Defendant Minnette Pass, Payroll/Admin clerk's response to defendant Segun K. Aborisade's

response on January 27, 2015 is provided in quote below:

"Please have him to complete another.

Not sure what happened."

70. On January 28, 2015 plaintiff complied with Admin Clerk Minette Pass' instruction by resending

the same completed form in adobe pdf format, plaintiff previously submitted on December 2,

2015

71. Till date plaintiff has not been setup with direct deposit despite multiple submissions of

completed request forms.

72. As a result of Defendants retaliatory conduct of out rightly refusing to provide for plaintiff an

administrative service which they themselves advertise on their company website as a benefit

all employees enjoy, plaintiff has paid $12 monthly maintenance fee to Bank of America, that he

would not have paid had his salary being directly deposited to Bank of America since January

2015. See screenshot of DAL Global Services list of Company benefits as listed on their web site

attached hereto as **Exhibit# 4**

73. Way back in July 2007 when plaintiff had a similar situation whereby he had to change his direct

deposit account, all it took was just an e-mail from plaintiff to DAL Global Human Resources

Representative and it only took just 2 weeks from date email was sent for the change kicked in.

See attached hereto as **Exhibit 5** the simple one page email request in 2007

14

74. On December 4, 2014 plaintiff's check was sent to Express Jet location another of DAL Global

    Services client site considered as an airline or aviation related site. After making several frantic

    efforts to locate his payroll live check, plaintiff got an e-mail from Defendant Segun K. Aborisade

    in which he copied Admin clerk Minette Pass which stated:

    *"Emmanuel,*

    *Your check was left at Express Jet and since you requested for it to be deliver to SunTrust.*
    *Timothy Harrison picks check up for SunTrust employees. It might already been picked up. Your*
    *check will be at SunTrust tonight at 2330."*

75. Defendant Delta Global Services has its payroll account in the same Bank of America as plaintiff

    yet Defendants have not been able to setup a direct deposit account for plaintiff since

    December 2014 when request was made.

76. Plaintiff is aware that setting up a direct deposit for an employee only takes a few mouse clicks

    and data entry keystrokes in a third party application or software.

77. Plaintiff is aware that all other employees similarly situated are setup with direct deposit in two

    weeks and do not have to pay bank maintenance fees for not having a direct deposit to their

    checking accounts or suffer any inconvenience as a result.

78. Direct deposit is listed on DAL Global Services web site as a benefit that is offered to all its

    employees. See **Exhibit: 4**

79. DAL Global Services pays its hourly employees in Atlanta weekly with work weeks ending at

    11:00 pm of every Sunday making each occurrence of figuring out where the live pay check was

    sent a frequent inconvenience more so than the stipulated DAL Global Services standard 2

    weeks waiting period for it to kick in.

80. On May 23, 2015 plaintiff made sure that he had not being paid for the 16 hours worked on May

    16, 2015, then plaintiff sent the Team Lead Mr. Chiles and copied Defendant Segun K.

    Aborisade, Supervisor Scott Stedtefeld an email which stated:

Dear Mr. Chiles, I'd like to bring to your attention, that I was not paid for 16 hours worked on week ending 05/17/2015 at the Suntrust Data Center on Saturday May 16, 2015. I worked from 0700- 2300 hours.

I will appreciate any assistance you can render to make sure I am paid salary owed ASAP.

Very truly yours,"

81. Delta Global Services does its payroll every Monday for live checks and direct deposit to hit employee account on Friday of same week.

82. Plaintiff had reasonable expectation that his pay check to be picked up on the morning of Saturday June 30, 2015 would have included the un-paid 16 hours worked on May 16, 2015 that he reported to Defendant Delta Global Services on Saturday May 23, 2015 in addition to the 16 hours worked on May 23 and May 24, 2015 in the SunTrust Data Center for a total of 32 hours, since there was ample time for it to be included in payroll for the following pay cycle which is prepared each Monday. However, the check plaintiff got on May 30, 2015 was for 24 hours only. Plaintiff was still owed 8 hours.

83. On May 30, 2015 plaintiff sent an email to Site Supervisor Mr. Stedtefeld and Team Lead Mr. Chiles which stated in quotes:

"Dear Mr. Stedtefeld/Chiles,

I am writing to register my displeasure on the shabby way my payroll has been handled by DGS. I sent you an email last week to let you know that I worked 16 hours (0700 - 2300 hours) at the Suntrust Data Center on Saturday May 16, 2015.
I was not paid for those hours, as I never got a pay check the following week. I signed another timesheet showing hours worked and left it in the sign-in book, in addition to sending all those copied in this email, an email to make you aware that I was not paid for hours worked. Despite all my efforts, my pay check this week was short 8 hours. Aside from the inconvenience, I am disturbed that a pattern is being formed here that seems deliberate for whatever reason, that, when I report any issue or concern, it is never addressed to a logical conclusion or is totally ignored.
I would like to know if there's any reason that is a fault of mine why I was not paid for the hours worked?
I am still owed 8 hours for shift worked at the Data Center on May 16, 2015

16

and I will appreciate if you consider this request urgent and important.

Thank you for your attention to this matter.

Sincerely,"

84. On June 1, 2015 plaintiff finally got two responses from Defendant Payroll Clerk Arnold Perkins to plaintiff's email of May 23, 2015 to Team Lead Mr. Chiles. The first response even though sent to plaintiff addresses Defendant Segun K. Aborisade. Defendant Arnold Perkins' response and the forwarded message by Defendant Segun K. Aborisade is further stated in quotes with email addresses redacted:

"From: arnold.perkins@xxxxx.xxx
To: emmanuelohai@xxxxxxx.xxx
Date: Mon, 1 Jun 2015 16:26:25 -0400
Subject: FW: Payroll issue; week ending 05/17/2015

Mr. Aborisade,


FYI, Officer Emmanuel Ohai was not paid for the week ending 05/17/2015 because *he failed to sign in on the SunTrust sign-in sheets* which, as you know, are used to generate the payroll.


The 16.0 hours for which Officer Ohai worked but was not paid will be uploaded to Payroll for pay date 06/05/2015.


Arnold Perkins

DGS Security

arnold.perkins@xxxxx.xxx


**From:** Aborisade, Segun
**Sent:** Friday, May 29, 2015 4:03 PM
**To:** Perkins, Arnold A
**Subject:** FW: Payroll issue; week ending 05/17/2015

Perkin,

Please verify that Emmanuel Ohai had been paid for the hours worked"

85. Plaintiff never responded to Arnold Perkins' email and has never had any direct communication

whether written or verbal with Arnold Perkins.

86. On the June 1, 2015 plaintiff received another communication from Defendant Arnold Perkins

on the same subject matter, the message which is stated in quotes:

"Mr. Aborisade,

According to the time sheets for the pay period ending 05/17/2015, Officer Emmanuel Ohai failed to sign in. That is the ONLY reason he was not paid. Contrary to his belief. There is no conspiracy to defraud him or in any way deprive him of the hours which he worked for DGS. The policy of signing in and signing out exists to preclude any payroll issues and works exceedingly well when procedures are followed.

In researching this issue, it turns out that Officer Ohai was actually overpaid by 8.0 hours for the week ending 05/24/2015. Therefore, DGS currently owes Officer Ohai 8.0 hours. That time will be paid to him in the check for pay date 06/05/2015, which should resolve his payroll complaints in full.

Arnold Perkins"

87. Statement by Arnold Perkins in his email to Segun K. Aborisade which states that:

"In researching this issue, it turns out that Officer Ohai was actually overpaid by 8.0 hours for the week ending 05/24/2015." is false

88. On Saturday May 23, 2015 Plaintiff wrote Segun K. Aborisade to let him know that plaintiff was

owed 16 hours worked on May 16 and 17, 2015

89. Plaintiff reported salary shortage to Defendant Segun K. Aborisade on May 23, 2015 with

enough time to be included on the payroll for week ending 05/17/2015 entered on Monday May

25, 2015.

18

90. If Arnold Perkins had indeed researched as he falsely claimed, he would have found out that
    plaintiff could not have been overpaid by 8 hours, since plaintiff was owed 16 hours worked on
    05/16/ 2015 and 05/17/2015

91. The alleged overpayment of 8 hours by Arnold Perkins is actually a deliberate attempt to
    frustrate plaintiff by keeping half of monies owed him for another week.

92. Plaintiff was actually expecting to collect a paycheck on May 30, 2015 that has 32 total hours
    paid for work done on 05/16/2015, 05/17/2015, 07/23/2015 and 05/24/2015 but instead was
    paid 24 hours total. Breakdown of which was 16 hours worked on 05/23/2015 and 05/24/2015
    and 8 hours paid out of outstanding 16 hours owed plaintiff from work done on 05/16/2015 and
    05/17/2015

93. Admin/Payroll clerk Arnold Perkins falsely asserts and intentionally misrepresents the facts by
    suggesting that the payment of 8 hours owed out of the 16 hours owed was an overpayment.

94. On June 13, 2013 I looked for my live pay check on arrival for work but did not find it so I sent an
    email to Defendant Segun K. Aborisade, which is stated in quotes:

"Hello Mr. Stedtefeld and Mr. Chiles,

On resuming work this morning, I observed that my pay check was not amongst those in the
Suntrust dock office mailbox. After looking for it myself, I had Mr. Gunnels (Portman Holdings
Supervisor) cross check for me and he too confirmed that he did not see a paycheck with my name;
checks he saw in there were for Ms. Adams, West and for Harrison.
Can you please help me find out what happened to my pay check as I worked 16 hours last
weekend at the Suntrust Data Center.

Thank you for your attention to this matter.

Truly yours,"

95. On same day June 13, 2015 I received response from Defendant Segun K. Aborisade, which

    stated in quotes:

"Ohai,

Did you have live check or direct deposit? I hope you signed the time sheets. I will have Arnold Perkins review the payroll on Mondsy morning to find out what went wrong."

96. Around the same June 2015 time period, DAL Global female employee Zainab C. assigned to SunTrust Account as plaintiff, failed to sign the SunTrust DGS time sheet and reported to Site Supervisor Scott Stedtefeld that she was owed salary for 16 hours worked that weekend in question received better treatment as a live check was cut for Zainab C. same day and she was apologized to by Defendant Segun K. Aborisade, who offered to allow her husband that works nearby Delta Global Services Administrative Office to stop by same day to pick up live check in lieu of salary being deposited in her direct deposit account at the bank that Friday.

97. Plaintiff called immediate supervisor Scott Stedtefeld around June 14, 2015 to ask him if he had forwarded the time sheets and put in my work hours as shown and signed on the time sheet and his response is provided verbatim in quotes:

"Ohai, you know there is something going on between you and those folks in the office"

98. Till date plaintiff is still owed salary for 16 hours worked at Suntrust Data Center on June 6 and 7, 2015 by Defendant Delta Global Services.

99. As a result of the foregoing reckless, discriminatory and retaliatory conduct by defendants, plaintiff has lost income and suffered emotional pain, loss of reputation and loss of amenity

## COUNT ONE

## EMPLOYMENT DISCRIMINATION
## [Against all Defendants]

100.       Plaintiff Ohai re-alleges and incorporates by reference each and every allegation set

forth in paragraphs 1-99 above

101.     At all times relevant Defendant(s) was and were engaged in an industry affecting

commerce and has employed 500 or more employees for each working day in each of twenty or

more calendar year and are subject to the provisions of Title VII

102.     At all times relevant, Defendant DAL Global Services is and was an "employer" as

defined in §701 (b) of the Civil Rights Act of 1964.

103.     Defendants engaged in employment discrimination by failing to take action based on

plaintiff's objection to the unlawful practices.

104.     All jurisdictional prerequisites to the initiation of a lawsuit under Title VII have been

met.

105.     Defendants' actions were conducted with malice and reckless disregard of federal civil

rights laws.

106.     Defendants' actions injured plaintiff and caused damages including but not limited to

the loss of wages, loss of benefits, and emotional distress all flowing from defendants' illegal

actions.

## COUNT TWO

## RETALIATION – TITLE VII
## [Against all Defendants]

107.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in

paragraphs 1-99 above

108.     Plaintiff engaged in protected activity by complaining about the unlawful practices and

harassment to his employer and by filing a Charge of Discrimination with the EEOC challenging

Defendants for subjecting him to disparate treatment.

109.     Defendants retaliated against plaintiff for complaints of unlawful conduct by subjecting

plaintiff to adverse compensation, denial of administrative support,  adverse employment

21

opportunity, adverse job posting, disparate benefits in comparison to other similarly situated

DAL Global employees.

110.    Defendants' actions in denying plaintiff administrative support show actionable

retaliation for engaging in protected activity.

111.    Defendants undertook each of the acts adversely affecting Plaintiff as alleged above in

reprisal for Plaintiff's opposition of practices made illegal by Title VII and because Plaintiff filed

complaints of discrimination. This conduct violated 42 U.S.C. §2000e-3(a).

112.    Defendants' retaliation further injured Plaintiff and caused damages including but not

limited to loss of wages, loss of benefits and emotional distress all flowing from Defendants'

illegal actions.

## COUNT THREE

## TORTIOUS BREACH OF CONTRACT
## [Against Defendant Delta Global Services]

113.    Plaintiff Ohai re-alleges and incorporates by reference each and every allegation set

forth in paragraphs 1-99 above

114.    In 2003 plaintiff entered into an employment contract with Defendant DAL Global

Services which stipulated that Defendant will be paid wages for hours worked weekly.

115.    Defendant DAL Global Services hired away to its client the services of plaintiff. Whereas

Defendant billed its client for the 16 hours worked by plaintiff on Defendant's client job site on

June 6, 2015, Defendant maliciously and intentionally failed to pay plaintiff for the hours worked

from 0630- 2300 at the Suntrust Data Center.

116.    Defendants further retaliated against plaintiff by denying him 16 hours wages worked

on June 6 and 7, 2015 without any explanation thereby breaching its contractual obligation to

plaintiff of implied duty of good faith and fair dealing.

22

117.     Defendants breach of employment contract which stipulates that plaintiff will be paid

weekly for work done is actionable under Georgia Act O.C.G.A. 13-6-14, GA  O.C.G.A. § 13-5-5

and Georgia Civil Tort Statue O.C.G.A. § 51-12-5.1

## COUNT FOUR

### FRAUD
### [Against Defendant Delta Global Services]

118.     Plaintiff Ohai re-alleges and incorporates by reference each and every allegation set

forth in paragraphs 1-99 above

119.     Defendant engaged in fraudulent activity when it asserted as its reason for changing

travel pass program policy that "Government regulations allow only employees working in an

airline or aviation related positions eligibility for free travel privileges"

120.     Defendant made intentional representations that they knew at that time to be false,

Defendant made these representations with intention and purpose of deceiving.

121.     Defendant's actions injured plaintiff and caused damages including but not limited to

loss of income, loss of benefits and emotional distress.

122.     Defendants deceitful actions which increased their bottom line and injured plaintiff is

actionable under  O.C.G.A. § 13-5-5

## PRAYER FOR RELIEF

To cure the conduct alleged in this action, Plaintiff respectfully prays to this honorable Court for

judgment as follows:

(i)     Declare that the actions of the Defendants alleged in this complaint

constitute discriminatory and retaliatory practices taken against Plaintiff

23

in reprisal of Plaintiff's opposition of practices made illegal by Title VII and because Plaintiff

filed complaints of discrimination. This conduct violated 42 U.S.C. §2000e-3(a);

(ii)     Plaintiff be awarded compensatory and exemplary damages;

(iii)    Defendant be ordered to compensate, reimburse and make whole the Plaintiff for all the

benefits Plaintiff would have received had it not been for the Defendant's illegal actions,

including, but not limited to, pay, benefits, training, promotion;

(iv)    Plaintiff recover reasonable attorneys' fees including litigation expenses and costs;

(v)     Plaintiff recover interest on the owed wages at the legal rate; and

(vi)    Such other relief as the Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff herein requests trial by jury of all issues in this complaint.

Respectfully submitted This 21st Day of September, 2015

Emmanuel Ohai
And Plaintiff pro se
2715 Tradd Court
Snellville, GA 30039
(404) 210-1822 (Phone)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Atlanta District Office**

100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
Atlanta Direct Dial: (404) 562-6821
FAX (404) 562-6909/6910

Emmanuel O. Ohai
2715 Tradd Court
Snellville, GA 30039

EEOC  Charge Number:    410-2015-04510
Respondent:             DAL GLOBAL SERVICES, LLC

Dear Mr. Ohai:

Your charge of employment discrimination has been reviewed by EEOC in accordance with the Commission's processing procedures. This letter will serve as an explanation concerning our determination of the merits on the above-referenced charge of discrimination. The determination relies on the following information:

On June 17, 2015, you filed a charge of discrimination alleging that you were discriminated against for complaining about a job posting.

Based upon the examination of the charge file information, we have determined that EEOC will discontinue further processing of your claim. Accordingly, you will have to file a private lawsuit if you want to continue to challenge the alleged discrimination. This practice is consistent with the Commission's Priority Charge Handling Procedures when the office has sufficient information from which to conclude that it is not likely that further investigation will result in a violation of the statutes we enforce.

Enclosed please find your **Dismissal and Notice of Rights and Information Sheet. If you want to pursue your charge further, you have the right to sue the employer named in your charge in U.S. District Court within ninety (90) days** from the date you receive the enclosed **notice.** Please read the documents carefully.

Sincerely,

Sharon C. Robertson, J.D.
EEOC Investigator

# Exhibit #1

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: **Emmanuel O. Ohai**
**2715 Tradd Court**
**Snellville, GA 30039**

From: **Atlanta District Office**
**100 Alabama Street, S.W.**
**Suite 4R30**
**Atlanta, GA 30303**

[  ] *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **410-2015-04510** | **Sharon Robertson,**<br>**Investigator** | **(404) 562-6836** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[  ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act

[  ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes

[  ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[**X**] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

JUN 2 9 2015

Enclosures(s)

**Bernice Williams-Kimbrough,**
**District Director**

*(Date Mailed)*

cc: **Darrell Cooper**
**General Manager**
**DAL GLOBAL SERVICES, LLC**
**980 Virginia Avenue**
**Atlanta, GA 30320**



Exhibit #1

Print                                                                                                    Close

From: **Howard, Scovadis** (Scovadis.Howard@delta.com)
Sent: Tue 8/16/11 1:51 PM
To:    Emmanuel Ohai (emmanuelohai@hotmail.com)
          1 attachment
          Ready Reserve Program2009FinalRevised07-11.doc (38.0 KB)

*Scovadis Howard*

Human Resources Representative

Delta Air Lines Global Services

Office: **404-773-5903**

Fax:   **404-714-0980**

scovadis.howard@delta.com

          HEAL THE PAST, LIVE THE PRESENT, AND DREAM THE FUTURE

# Exhibit #2

# ▲Delta Air Lines
# *Global Services*

A wholly owned subsidiary of Delta Air Lines

To: Dal Global Ready Reserves- Security Personnel

From: Alan T. Payne, Account Manager

Subject: The Ready Reserve Program

Date: July 15, 2011 (revised)

To all members of the Ready Reserve Program, a welcome is in order for the new members and thanks go out to the already inducted members.

- **All schedules are to be submitted not later than the 20th of the proceeding month with a working phone number.** An example: for February 2009, all schedules must be submitted not later than the 20th of January 2009.

- Once schedules are submitted, **they will be reviewed and additional days may be requested based on operational needs.**

- **Each monthly schedule should include a minimum of 48 hours and at least one shift during weekend time.** Times submitted should spread throughout the entire month with shift variations. Schedules may be submitted with some approved operational needed times.

- Each Ready Reserve Officer **must** call in two hours before reporting to work for all scheduled times. If you are not needed for the submitted time, you will be told not to report for work and may be given alternate times for replacement. You should only report for work only on approved scheduled days and times. **If you report for duty without calling and is not needed, you will not be allowed to work and will not be paid.**

- **Each Ready Reserve Officer is required to work at least one or more Holidays throughout the year.**

# Exhibit #2

- Each Ready Reserve Officer reports directly to the Area Supervisor for work assignments, call offs, requests, scheduling, or any other needs.

- Please remind the Area Supervisor, Scovadis Howard, or Alan Payne if you would like to be **on call** for emergency response calls for any times. If so, please provide all alternative contacts, i.e., home phone numbers, cell phone numbers, email addresses, or any other contacts available.

**PLEASE DO NOT TEXT ANY OF THE LISTED NUMBERS BELOW !**

**Area Supervisor's Phone is accessible 24/7............■■■■-4179**

**Alan.T.Payne@■■■■■■**
**■■■■-3803 office**
**■■■■-7091 cell**
**Segun.Aborisade@■■■■■■**
**■■■■-3815 office**
**■■■■-8014 cell**
**Scovadis.howard@■■■■■■**
**■■■■-5903 office**
**■■■■-1916 fax**
**John.Murray@■■■■■■**
**■■■■-4316 office**
**■■■■-7397 cell**

Exhibit #2



**DAL Global Services, LLC.**
Post Office Box 20706, Dept. 937
Atlanta, Georgia 30320-6001

December 20, 2013

**To: All Delta Global Security Personnel**
**Subject: Pass Policy Change - Personnel Assigned to Non-Aviation Positions**
**From: DGS Pass Bureau**

One of the most valued privileges DGS employees enjoy is pass travel. Through the Pass Travel Program employees, retirees, eligible family members, and designated travel companions enjoy free and/or reduced-rate, space available pass travel to places around the world.

The Pass Travel Program regularly undergoes a comprehensive review to determine if changes are needed. As a result of a recent review and effective January 13, 2014, changes will be introduced to Delta Global Security employees who do not work in an airline or aviation related assignment.

Effective January 13, 2014, changes in the Pass Travel Program for active Delta Global Security employees and their eligible pass riders are noted below:

- All travel on or after the effective date of 1/13/2014, will require purchase of a yield fare ticket, including any segments that were listed in TravelNet prior to the effective date. To comply with this change, you must cancel any future listings and rebook them after 1/13/2014 so you will be prompted to purchase a yield fare ticket on TravelNet. If your travel occurs over the transition date and while you or your pass riders are mid trip, a new listing must be created after 1/13/2014 and a yield fare ticket must be purchased for the return. There will be no limit to the number of yield fare flights you or your eligible pass riders may use.

- Eligible pass riders will include employee, spouse/domestic partner, minor children (under 19), full-time students (up the age 24), children who are active military (up to age 24), and parents. Travel companions and non-dependents are not eligible for pass privileges and the system will automatically revoke any existing ineligible pass riders after 1/13/2014.

- Delta Global Security employees not on an airline or aviation related assignment will no longer be eligible for Zonal Employee Discount (ZED) travel on other airlines.

- Delta Global Security employees not working on an airline or aviation related assignment do not qualify for post employment retiree pass privileges.

The pass travel policy remains unchanged for Delta Global Security employees who are on an airline or aviation related assignment.

The DGS Pass Policy documents will be revised to reflect these changes. Should you have questions or need additional clarification of these changes, please contact the DGS Pass Bureau at ████████-9038 or pass.dgs@████████.



**Pass Policy Change – Delta Global Security Personnel Assigned to Non-Aviation Positions**
# Q & A – Frequently Asked Questions

### 1.  Why is DGS making this change?

From time to time, Delta reviews the pass program for Delta employees as well as its subsidiaries.  Government regulations allow only employees working in airline or aviation related positions eligibility for free travel privileges. In order to still be able to provide travel privileges to those working for Delta Global Security and those not working on airline or aviation related assignments, DGS is required to assess the yield fare. In most cases, this is still considerably less than a confirmed seat for the same routing.

### 2.  Who is eligible for my pass privileges?

The employee may choose to add their spouse or domestic partner, minor children (under age 19), full-time student children and active duty military children (over 18 and under 24) as well as the employee's parents (step-parents, if applicable).

### 3.  Am I eligible to add a travel companion or a non-dependent child who is not a full-time student?

Delta Global Security employees not working on an aviation related assignment are not eligible to add a travel companion or add a non-dependent child (over 19) who is not a full-time student at an accredited college or university or active duty military (under 24). The system will automatically revoke any existing ineligible pass riders after 1/13/2014.

### 4.  What is an airline or aviation related assignment?

If the Delta Global Security assignment is working directly for Delta or another airline, this is considered "airline or aviation related". In most cases, these positions are at the airport or in office positions supporting Delta or another airline.

### 5.  What is a yield fare and how is the yield fare computed?

A yield fare is a cents per mile as calculated by Delta through TravelNet and the factor for computing a yield fare may change periodically.  To check the yield fare, go to TravelNet, select the flights you prefer and click "continue", beneath the itinerary section on the next page click on "calculate buddy pass/yield fares".

## Calculate Buddy Pass/Yield Fares

The **yield fare** "total" includes the yield fare "base fare" and any applicable taxes. The fare may also include any international taxes and fees, if applicable.  Complete your listing and provide credit card information as required for payment.

### 6.  Are my flight days limited when using yield fares?

No, you and your eligible pass riders may purchase an unlimited number of yield fare passes.

### 7.  Do I still have to pay international taxes and fees?

Yes, these will be collected when the yield fare ticket is issued and your credit card is used for payment. Also see #5 above.

### 8.  How do I list for a flight?

Listing is done on TravelNet by choosing Leisure Travel and then the Flight Availability & Listing tab. For yield fare listings, you are required to provide your credit card for payment of the yield fare.

### 9.  Can I get a refund on an unused yield fare ticket?

Yes, a refund can be requested on TravelNet within a year of purchase.

### 10.  Can a yield fare ticket be changed if I need to change my routing or take another flight?

Yes, you can make changes in TravelNet. If there is a credits due, this amount will be credited back to the original credit card when the yield fare ticket is re-issued for the new routing. If there is an additional collection, you will be asked for your credit card to pay any difference. If you are at the airport, the agent may refer you to reservations for assistance.

Exhibit #3

**11. Is a yield fare ticket confirmed?**

No, yield fare tickets are stand-by. When you check in at the kiosk or online, you are placed on the active stand-by list in order of applicable priority and date of hire.

**12. Can I still check-in for my flight online?**

Yes, go to www.delta.com and choose check-in, add your record locator/confirmation # and boarding city. Check in and print your seat request.

**13. What is my stand-by priority?**

Your priority code has not changed – S3C on  Delta mainline flights, S3CR on Delta connection carriers; Chautauqua, Shuttle America, Endeavor, Go-Jet and Compass and S4 on Express Jet and SkyWest.

**14. If the outbound portion of my trip occurs before 1/13/2014 and the return is after 1/13/2014, do I need to do anything special?**

Yes, the return portion of your trip needs to be cancelled.  You will need to re-list your return flight after 1/13/2014 and the system will automatically calculate the yield fare and request credit card payment.

**15. Am I eligible for Buddy Passes?**

Delta Global Security employees are not eligible for buddy passes.

**16. May I retire and get flight privileges?**

Delta Global Security employees not on an airline or aviation related assignment do not qualify for post retirement retiree pass privileges.

**17. Am I eligible for ZED fares?**

If you are working on an assignment that is not airline or aviation related, you are not eligible for ZED fares.

**For further questions, please contact the DGS Pass Bureau at ▓▓▓▓▓▓▓-9038 or contact by e-mail at** pass.dgs@▓▓▓▓▓▓▓
**Hours: 8A-5P, Monday through Friday**

Exhibit #3



deltaglobalsecurity.com

HOME    SERVICES    ABOUT    CLIENTS    DGS DIFFERENCE    TRAINING    TESTIMO

## EMPLOYMENT

Delta Global Security offers you great opportunities to build a rewarding career in the security industry. We offer one of the best benefits package in the industry.

**Company Benefits Include:**

- Insurance Benefits
    - Health Insurance
    - Dental Insurance
    - Short Term Insurance
    - Life Insurance
- Weekly Pay
- Travel Privileges – *Flight benefits on Delta Air Lines*
- Jury Duty Pay
- Delta Community Credit Union
- Bereavement Pay
- 401K Plan
- Bonus Pay
- Holiday Pay
- 30 Day Leave of Absence
- Military Leave of Absence
- Family Medical Leave of Absence
- Direct Deposit

**Apply for a security officer job**

OUR

To pa
wellb
their
proac



Exhibit #4

Print                                                                                                                   Close

From:  **Emmanuel Ohai** (emmanuelohai@▮▮▮▮▮▮▮▮)
Sent:  Sun 7/01/07 11:27 AM
To:    Scovadis.Howard@▮▮▮▮▮▮

Sco.!

Good morning. Could you please change my direct deposit account as soon as possible to the one
below.

REF: <u>EMMANUEL OHAI EMP ID# ▮▮7051</u>

**Bank of America**

4002 Stone Mountain Hwy 78, Snellville, GA 30039

Account Name: **Emmanuel Ohai**

Routing Number: ▮▮▮▮▮052

Account Number: ▮▮▮▮▮▮44410

Please call me at ▮▮▮▮▮-1822 if you have any questions. Thanks and have a wonderful week.

Emmanuel.

Exhibit #5

## Stedtefeld, Scott

| | |
|---|---|
| **From:** | Pass, Minnette <minnette.pass@~~~~~~~~> |
| **Sent:** | Monday, February 09, 2015 7:52 PM |
| **Cc:** | Cooper, Darrell G; Aborisade, Segun |
| **Subject:** | Temporary Assignmnet Rover 021615 |

---

### INTEROFFICE MEMORANDUM

---

| | |
|---|---|
| **TO:** | ALL DGS OFFICERS AND STAFF |
| **FROM:** | MINNETTE PASS |
| **SUBJECT:** | TEMPORARY ASSIGNMENT - ROVER |
| **DATE:** | FEBRUARY 9, 2015 |
| **CC:** | DARRELL COOPER, GENERAL MANAGER |
| | SEGUN ABORISADE, ACCOUNT MANAGER |

---

Currently we have a temporary need for a rover.

Available Shifts:

3rd Shift Rover: Thursday and Friday   2300 - 0700

General Rover: Shift assignment varies based on business needs. Applicant must be flexible

If interested complete the attached job posting form and submit
to dgssecurity@~~~~~~~~~~~~~~~~ or fax to ~~~~~~-1916.  Only those submitted to the
address or fax number above will be considered.

**You must respond no later than close of business Monday, February 16, 2015.**

When submitting be sure to state your interest in the above stated TEMPORARY ASSIGNMENT
– ROVER.

Exhibit # 6

1